UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JEREMY COOPER | * | CIVIL ACTION NO. 23-2631 |
| | * | |
| VERSUS | * | SECTION: "J"(1) |
| | * | |
| MARTIN O'MALLEY, | * | JUDGE CARL J. BARBIER |
| COMMISSIONER OF THE SOCIAL | * | |
| SECURITY ADMINISTRATION | * | MAGISTRATE JUDGE |
| | * | JANIS VAN MEERVELD |
| ************************************* | * | |

REPORT AND RECOMMENDATION

The plaintiff, Jeremy Cooper, seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his claim for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. § 423. The matter has been presented for decision by the parties' briefs in accordance with the Supplemental Rules for Social Security Actions. (Rec. Docs. 6, 10, 13). For the following reasons, IT IS RECOMMENDED that the decision of the Commissioner be affirmed and the appeal of the plaintiff be denied.

**Procedural Background**

Mr. Cooper applied for DIB on February 20, 2020, asserting a disability onset date of August 21, 2019. He alleged the following illnesses, injuries, or conditions: Crohn's disease and herniated disc. On August 7, 2020, his claim was denied by the state agency. He requested reconsideration, which was denied on November 9, 2021.

Mr. Cooper obtained counsel and requested a hearing before an Administrative Law Judge ("ALJ"), which was originally scheduled for July 5, 2022. However, Mr. Cooper did not appear, and his counsel reported that Mr. Cooper had to go to the hospital for pain. The hearing was reset and held on October 11, 2022. On October 25, 2022, the ALJ issued an adverse decision. Mr.

Cooper timely appealed to the Appeals Council, which denied review on May 19, 2023. In so ruling, the Appeals Council declined to accept as exhibits the additional medical records that he submitted. It found the records dated August 9, 2019, through October 18, 2022, did not show a reasonable probability that they would have changed the outcome of the decision. It found that the evidence dated after the date of the ALJ's decision did not relate to the period at issue.

On July 20, 2023, Mr. Cooper filed a Complaint in federal court to review the Commissioner's decision. (Rec. Doc. 1). The Commissioner answered and filed the administrative record. (Rec. Docs. 3, 4). The parties filed briefs in accordance with the Supplemental Rules for Social Security Actions. (Rec. Docs. 6, 10, 13). Mr. Cooper is represented by counsel.

## Evidence in the Record

*Hearing Testimony and Disability Application Forms*

At the hearing before the ALJ on October 11, 2022, Mr. Cooper was 32 years old. R. at 89. He testified that he went through eighth grade in school and that he had been in special education since approximately third grade. R. at 89. In his application for disability benefits, though, he reported that he had completed tenth grade and that he did **not** attend special education classes. R. at 281. He also reported that he can read and understand English and that he can write more than his name in English. R. at 279. In his function report, Mr. Cooper reported that he usually checks email each morning and may read a book for about 15 minutes and watch a movie in the afternoon. R. at 290. His hobbies included watching TV, reading, and playing games on his phone. R. at 293.

Mr. Cooper testified that he had worked as a merchandise stocker and a soft drink distributor. R. at 90. His first stockman job was at a Winn-Dixie grocery store. Id.  In his application for disability benefits, he reported that he had worked as a stocker for ten years. R. at 281.

Mr. Cooper testified that he has not worked since August 2019 and that his severe Crohn's disease prevents him from working. R. at 91. He explained that he had lost his right kidney, had lost parts of his intestines, and had bladder surgery. Id.  He experiences pain and suffering. Id.  He takes Humira once a week. Id.  But he does not take any pain medication. R. at 92. Because of the Crohn's disease, he can only take Tylenol. Id.  Anything else will cause bleeding. Id.

Mr. Cooper testified that he also has problems with his back because he was in a serious car accident. R. at 93. He testified that the heaviest thing he could lift would probably be 20 pounds. Id.  The longest he can stand is probably 20 to 25 minutes. Id.  He testified that his back pain had gotten worse but that he was going to return to physical therapy. R. at 93-94.

His girlfriend does the cooking and cleaning at home. R. at 92. He testified that he could probably do so himself if he had to. Id. In his Function Report, he reported that he can prepare his own meals of sandwiches and frozen dinners and that he can iron and fold clothes. R. a 291. But he cannot do yard work. R. at 292.

The vocational expert at the hearing classified Mr. Cooper's past work as a stocker as Dictionary of Occupation Titles ("DOT") code 299.367-014, heavy duty with an SVP of 4. R. at 94.

The ALJ asked the vocational expert to consider a hypothetical individual with the same age, education, work history, and transferrable skills as Mr. Cooper and assume that person was limited to lifting 20 pounds occasionally and 10 pounds frequently; walking and standing for four hours of an eight-hour work day for 45 minutes at a time; sitting for six hours in an eight-hour work day for two hours at a time; occasionally stooping, climbing, crouching, kneeling, or crawling; no climbing of ladders; can push and pull 20 pounds occasionally and ten pounds frequently; the left lower extremity is occasionally numb and could not feel texture; and the

individual needs a bathroom facility available at the work place and would be off task 5% of the day to use it. R. at 95. The vocational expert testified that such an individual could not perform Mr. Cooper's past relevant work. R. at 96. However, he could perform the following jobs: price marker, DOT code 209.587-034, SVP 2, light duty, with 27,356 jobs available in the national economy; [1] fundraiser, DOT code 293.357-014, SVP 2, light duty, and 38,701 jobs available in the national economy; and office helper, DOT code 239.567-010, SVP 2, light duty, and 6,822 jobs available in the national economy. Id. The vocational expert confirmed that her testimony was consistent with the DOT. R. at 97. She confirmed that she had taken into account that Mr. Cooper has an eighth grade education through special education. Id.  When the ALJ asked whether the hypothetical person could perform the same jobs if he read on a third grade level, the vocational expert explained that the jobs required reading comprehension on a fourth through sixth grade level. R. at 97-98. She confirmed that if the individual could read on a fourth grade level he would likely be able to perform the jobs. R. at 98.

Mr. Cooper's attorney asked the vocational expert to consider a hypothetical person who is limited to graphic instruction as opposed to by reading. R. at 99. The vocational expert testified that a person who can only use pictures to follow instructions would not be able to perform the listed jobs. Id.

*Medical Records:*

Mr. Cooper suffered an injury while driving for his employer Pepsi on April 5, 2019, and treated at a Concentra Medical Center for several months following the incident, through what appear to be worker's compensation benefits. R. at 398-448. The records from this time period reflect reports of lower back pain, typically of an intensity of 5 out of 10. Id. His muscle

---

[1] The vocational expert reduced the number of jobs available by 20% to allow for jobs where there is a chair.

strength/performance was 4/5. Id. He was always released to work albeit with restrictions:  most visits included a lifting and push/pull restriction of 20 pounds frequently, although this was increased to 30 pounds in April and May 2019,  and reduced to 10 pounds in June 2019. Id.

An MRI was performed on June 5, 2019. R. at 443. A large central disc protrusion at L5-S1 was noted with moderate spinal canal narrowing. Id.; R. at 553.

Mr. Cooper began treating with Dr. Marco Rodriguez at LA Health Solutions in July 2019. R. at 590. He reported his low back pain was 6 now and 9 at worst. Id.  His left leg pain was 10 now. Id.  Upon examination, he had tenderness to palpation about the bilateral lower lumbar facet joints. R. at 592. This pain increased with extension and rotation in either direction. Id.  He had a negative Faber's test and no groin pain with hip range of motion. Id. Left sided straight leg raise produced pain posteriorly and laterally down the leg into the mid-calf. Id.  He had 5/5 strength in bilateral hip flexors, quads, tibialis anterior, and gastrocsoleus. Id. Decreased sensitivity to light touch about the left dorsal/lateral aspect of his left foot was noted. Id.

Mr. Cooper underwent lumbar transforaminal epidural steroid injections ("ESI") on August 8, 2019. R. at 594. He reported a pain score of 6/10 prior to the procedure and 0/10 afterwards. Id.

Mr. Cooper followed up at LA Health Solutions on September 3, 2019, and was seen by physician's assistant Harley Augustine. R. at 587. He reported about 70% initial relief with the ESI in August 2019. Id. But at the time of the appointment, his left leg relief was only about 30%, though low back pain was still at 70%. Id. He reported taking over the counter Tylenol as needed for pain. Id. On examination, he had tenderness to palpation at the bilateral lower lumbar facet joints. R. at 588.  He had strength of 5/5 in the bilateral lower extremities. Id.

Mr. Cooper returned to see Dr. Rodriguez at LA Health Solutions on September 24, 2019, reporting his low back and left leg pain were improving. R. at 584. Low back pain was 3 now, 7 at worst and left leg pain was 3 now, 7 at worst. Id. On examination, he had tenderness to palpation at the bilateral lower lumbar facet joints. R. at 585. Left straight leg test caused tingling down the posterolateral leg to the distal calf. Id. He had strength of 5/5 in bilateral lower extremities. Id. He presented to discuss surgical options for his persistent left leg radiculopathy. Id. But, his symptoms had been improving over the last few weeks. Id. It was noted that his work status was presently light duty with no lifting, pushing, or pulling more than 20 pounds, no prolonged standing, and alternate sitting and standing every 45 minutes. Id.

Mr. Cooper attended physical therapy in late October and early November 2019. R. at 574-81. On November 5, 2019, he followed up with PA Augustine at LA Health Solutions. R. at 571. He had completed four work conditioning sessions since his last visit. Id. He reported an improvement in symptoms. Id. His low back pain was 1 now 5 at worst. Id. His left leg pain was 1 now 7 at worst. Id. He had a negative straight leg raise test bilaterally and 5/5 strength in bilateral lower extremities. R. at 572.

He continued at physical therapy throughout November and into December 2019. R. at 527-69. He followed up with PA Augustine at LA Health Solutions on December 31, 2019. R. at 524. Mr. Cooper reported that he had discontinued physical therapy because he had been experiencing symptoms during therapy. Id. He reported his symptoms had increased since his last visit. Id. He reported that the ESIs provided about 3 months of about 90% relief of lower back and leg symptoms. Id. He reported his pain had returned to pre-injection levels. Id. His examination results were similar to his November 5, 2019, appointment. R. at 525.

Mr. Cooper underwent lumbar transforaminal ESIs on January 24, 2020. R. at 522. At his February 11, 2020, appointment with PA Augustine at LA Health Solutions, he reported about 50% relief of his lower back and leg symptoms following the ESIs. R. at 519. He reported sleeping better. Id. His low back pain was 3 now, 7 at worst and his left leg pain was 3 now, 8 at worst. Id.

When he returned to see PA Augustine at LA Health Solutions on March 10, 2020, Mr. Cooper reported that his lower back and leg symptoms had returned to pre-injection levels since his ESIs in January. R. at 516. He reported his neck pain was manageable with taking Tylenol as needed. Id.  He reported lower back pain of 3 now, 7 at worst. Id.  On examination, he had tenderness to palpation at bilateral lower lumbar facet joints. R. at 517. The pain was increased on extension and rotation in either direction Id. His strength was 5/5 in the right tibialis anterior, 4+/5 in the left tibialis anterior, and 5/5 bilaterally in hip flexors, quads, and gastrocsoleus. Id.

Mr. Cooper had lumbar medial branch blocks on May 15, 2020. R. at 511. He followed up with LA Health Solutions on May 22, 2020, and reported 100% relief of low back pain for 1 day with the L4-S1 medial branch blocks R. at 508. His low back pain was 2 out of 10 at the time of the visit, which he reported was its worst. Id.

He returned to see Dr. Rodriguez at LA Health Solutions on May 26, 2020, to discuss surgery on his lumbar spine. R. at 505. It was noted he had undergone right L4 S1 medial branch blocks with excellent short-term relief. Id.  Left leg symptoms were noted to be minor compared to his back pain, which was noted to be the "the limiting factor for his ability to return to work." Id.  It was noted that he takes over-the-counter Tylenol because of fear of causing issues with his underlying Crohn's disease. Id.  He reported his low back pain was at 2 out of 10, and 4 at the worst. Id.  Dr. Rodriguez noted that Mr. Cooper was a good candidate for medial branch rhizotomies. R. at 506. It was also noted that Mr. Cooper's work status was light duty, with no

lifting, pushing, or pulling more than 20 pounds, no prolonged standing, and alternative sitting and standing every 45 minutes. Id.

At the pre-operative appointment on June 18, 2020, Mr. Cooper reported his low back pain was 5 out of 10 at the time of the appointment and 7 at worst. Id.  On examination, he had tenderness to palpation about the right much worse than left lower lumbar facet joints. R. at 503. He had a negative straight leg test bilaterally and 5/5 strength. Id.

Mr. Cooper underwent right L4, L5, and S1 endoscopic medial branch rhizotomies/neurotomies on July 2, 2020. R. at 498. At his post-operative follow up on July 17, 2020, Mr. Cooper reported back pain present "sometimes" at a level of 2 out of 10 during the appointment and 4 out of 10 at its worst. R. at 495. On examination, he had mild tenderness to palpation around the lumbar incisions. R. at 496. Pain increased with extension and rotation to the right. Id.  He had strength of 5/5 in his bilateral hip flexors, quads, tibialis anterior, and gastrocsoleus. Id. He had slight decreased sensation about the left lateral foot. Id.

Mr. Cooper presented to UC Gastroenterology Clinic on January 7, 2020. R. at 826. A history of Crohn's disease was noted. R. at 826. It was noted he had been lost to follow up since 2018. Id.[2]  He reported one brown stool a day. Id.  He reported two flares of crampy abdominal pain since 2018, but said he had received a steroid injection at urgent care that resolved his symptoms. Id. An esophagogastroduodenoscopy ("EGD") and colonoscopy were ordered. R. at 831. It was noted that Mr. Cooper would be started on biologic once the studies were back. Id.

His colonoscopy appointment was rescheduled due to the pandemic and then due to his back surgery. R. at 817. He followed up with the UMC Gastroenterology Clinic on July 22, 2020,

---

[2] Later records note that Mr. Cooper was diagnosed with Crohn's disease in 2011 or 2012. R. at 606.  He reported having a right ureteral stricture s/p Boari bladder flap in May 2012. R. at 757. Following that, he had been taking Remicade, but stopped in 2018 because he was feeling good. Id.; R. at 773.

reporting abdominal pain every two weeks. Id.  He normally has 1-2 bowel movements per day, at times formed and other times loose. Id.  The EGD and colonoscopy was performed on August 6, 2020. R. at 789. The final diagnosis following biopsies was active colitis with acute cryptitis, acute granulation tissue with focal granuloma, fragments of colonic mucosa without significant histopathologic abnormalities, negative for dysplasia or malignancy, and hyperplastic mucosal colonic changes. R. at 796.

Mr. Cooper followed up with the UMC Gastroenterology clinic on September 9, 2020. R. at 780. Mr. Cooper reported 3-4 watery diarrhea like stools daily with right lower quadrant pain. Id.  He reported relief from the steroid shot he had been given at Ochsner the previous month. Id.

Mr. Cooper underwent an MRI Enterography with and without contrast on September 16, 2020. R. at 778. The MRI yielded the following impression: findings likely represent active chronic inflammatory bowel disease involving distal ileum for at least 14cm; findings concerning for entero-enterofistula or enterocolonic fistula; and new interval increase in diffuse hydroureteronephrosis, distal thickening of the right ureter and right bladder base was concerning for fistulous formation from inflammatory bowel disease. R. at 778-79. Imaging was conducted on September 30, 2020, showing left kidney uptake was 86% and right kidney was only 14%. R. at 769-70.

Mr. Cooper presented to the UMC Emergency Department on October 12, 2020. R. at 752. He had been transferred from an outside facility for colorectal surgery and urology evaluation. Id. Id.  He had normal bowel function. R. at 755. He reported experiencing abdominal tightness over the last year that had worsened. Id.  He had started having right lower quadrant pain over the last two months. Id. And over the past two weeks he had been having pneumaturia. Id. He began having constant right flank pain the previous night. Id.

Mr. Cooper underwent a right nephroureterectomy (kidney removal), bladder mobilization, ileocecectomy, and ileorectal fistula take down, on October 20, 2020. R. at 731-33. He was doing well at his follow up on October 27, 2020. R. at 674-76. At his November 20, 2020, follow up with the Colon Renal Clinic, he reported minimal pain. R. at 672. He reported about 3-4 bowel movements per day and periodic gastro-colic reflex. Id. November 25, 2020, Mr. Cooper followed up with UMC Gastroenterology Clinic. R. at 623. He was currently not on any medications. Id. He reported 1-2 soft non bloody bowel movements daily. Id.

Mr. Cooper presented to UMC on January 25, 2021, to establish care. R. at 606. He reported he was doing well overall. Id. He reported having up to three bowel movements per day, sometimes with loose stool or diarrhea. Id. He denied abdominal pain or nausea. Id. He also discussed his back pain. Id. It was noted that his Crohn's disease appeared stable. R. at 609. It was noted that his low back pain did not seem particularly remarkable and that his exam was effectively normal. Id.

Mr. Cooper followed up with the UMC Gastroenterology Clinic on May 5, 2021. R. at 647. He reported doing well overall. Id. He reported solid/soft stool with two to four bowel movements daily. Id.

On July 6, 2021, Mr. Cooper followed up at the UMC Gastroenterology Clinic. R. at 628. It was noted that at the last visit, Remicade was discontinued and he was started on adalimumab. Id. He reported that he had completed the medications, but the physician explained that he would have to be on these medications life long and that he should call the Clinic or the pharmacy for refills if he runs out. Id. He reported watery non-bloody bowel movements up to four times per day. Id. He endorsed incomplete evacuation and reported sitting on the toilet for hours. Id. He reported having these symptoms since his surgery. Id.

Mr. Cooper underwent a physical evaluation by Michael Day of AMCE physician's group on November 3, 2021. R. at 862. Mr. Cooper reported being unable to work due to Crohn's disease and a herniated disk. Id.  He reported being able to feed, bathe, dress, toilet, and transfer without assistance. R. at 863. His ability to do yard work and housework was very limited due to his lower back pain. Id.  However, he was able to help out with some household chores like cooking, shopping, and meal preparation with rest periods. Id.  He reported managing his own finances. Id.

Upon examination, Mr. Cooper had a normal gait and did not use an assistive device. R. at 864. He could tandem walk and stand on his heels and toes. Id. He could bend without holding on to the table for support. Id. He did not attempt to hop due to reported left leg and lower back pain. Id.  He had 5/5 muscle strength in his upper and lower extremities. Id.  His straight leg test was negative seated and supine. Id.  His range of motion was normal in his upper and lower extremities. R. at 865. He had normal reflexes. Id.  But he had numbness to light touch on his fourth and fifth toes on his left foot. Id.  He was alert and oriented. Id.  His attention span, ability to communicate, and ability to follow two and three step commands and short term memory seemed appropriate. Id. Dr. Day issued the following diagnosis and prognosis: (1) Crohn's disease on Humica and methotrexate still with frequent diarrhea, no weight loss or blood stools; (2) hypertension or elevated blood pressure; and (3) lower back pain with herniated disk at L5-S1 with neural foraminal Stenosis. R. at 865-66. Dr. Day issued the following functional assessment:  maximum standing/walking of four to six hours a day due to back pain; unlimited sitting capacity; lifting/carrying 20 pounds occasionally and 10 pounds frequently due to lumbar spine, paraspinal muscles, and herniated disk; occasional climbing; and able to balance, stoop, kneel, crouch, and crawl at least four hours in an eight our day due to Crohn's disease and lower back pain. Id.

The state agency reviewing physician, Dr. Susan Yoshida, reviewed the medical records and opined that Mr. Cooper has the residual functional capacity to occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk 4 hours, and sit about 6 hours in an 8-hour workday. R. at 106. She opined that he could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl, but never climb ladders, ropes, and scaffolds. R. at 106-07. On reconsideration, state agency reviewing physician Dr. Nancy Cook found the same residual functional capacity. R. at 115.

## Decision of the Administrative Law Judge

The ALJ found that Mr. Cooper meets the insured status requirements of the Act through December 31, 2024, and that he has not engaged in substantial gainful activity since August 21, 2019. The ALJ determined that Mr. Cooper has the following severe impairments:  degenerative disc disease and Crohn's disease. But the ALJ found that Mr. Cooper does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

Next, the ALJ considered the record and found Mr. Cooper has the residual functional capacity to perform light work as defined by 20 C.F.R. § 404.1567(b) except that he can lift and/or carry 20 pounds occasionally and 10 pounds frequently; walk and/or stand for four hours in an eight-hour work day for forty-five minutes at a time; sit six hours in an eight-hour workday for two hours at a time; occasionally stoop, climb, crouch, kneel, or crawl; never climb ladders; push/pull twenty pounds occasionally and ten pounds frequently; have occasional numbness in the left lower extremity and not feel texture; require the availability of a bathroom facility at the workplace and be off task five percent of the day to use it; and read at a fourth grade level. The ALJ found that Mr. Cooper is unable to perform any of his past relevant work.

The ALJ found that on the alleged date of disability onset, Mr. Cooper was 29 years old, which is defined as a "younger individual" under the regulations. The ALJ found that Mr. Cooper has a limited education. And the ALJ determined that transferability of job skills was not material to the determination of disability.

Relying on the vocational expert's testimony and consideration Mr. Cooper's age, education, work experience, and residual functional capacity, the ALJ found that there are jobs that exist in significant numbers in the national economy that Mr. Cooper can perform. Accordingly, the ALJ concluded that Mr. Cooper has not been under a disability as defined by the Act from August 21, 2019, through the date of decision.

### Statement of Issues on Appeal[3]

Issue No. 1.    Did the ALJ err in failing to qualify Mr. Cooper's Crohn's disease as a disability?

Issue No. 2.    Did the ALJ err in determining Mr. Cooper's educational level?

Issue No. 3    Did the ALJ err in relying on vocational expert testimony who only spoke to jobs that are inconsistent with Mr. Cooper's educational history and mental impairments?

Issue No. 4:    Did the Appeals Council err by failing to review supplemental records submitted regarding Mr. Cooper's educational impairment?

Issue No. 5:    Did the ALJ err in considering Mr. Cooper's testimony about his pain?

Issue No. 6:    Did the ALJ err in failing to find that Mr. Cooper had a severe mental impairment?

---

[3] The Court has combined some of the issues listed by Mr. Cooper in his opening brief to better align with the arguments he raises in the Argument section of his brief.

## Analysis

### I. Applicable Law

#### a. Entitlement to Benefits under the Act

To be considered disabled under the Act, a claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant bears the burden of proving that he is disabled within the meaning of the Act. Fraga v. Bowen, 810 F.2d 1296, 1301 (5th Cir. 1987).

Pursuant to the regulations promulgated under the Act, the Commissioner engages in a five-step sequential evaluation process to determine whether an individual qualifies as disabled. See 20 C.F.R. § 404.1520(a)(4). At each step, if the Commissioner determines that an individual is or is not disabled (depending on the step), her decision is made on that basis and she does not proceed to the next step. Id. Following these same five steps, the ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity (whether the claimant is working); (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals the severity of an impairment listed in 20 C.F.R., Part 404, Subpart B, Appendix 1; (4) whether the impairment prevents the claimant from doing past relevant work (whether the claimant can return to his old job); and (5) whether the impairment prevents the claimant from doing any other work.

Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005). The burden of proof is on the claimant in steps one through four, and then at step five, the Commissioner must "show that the claimant can perform other substantial work in the national economy." Id. Once the Commissioner has made this showing, the claimant bears the burden to rebut the finding. Id.

An assessment of the claimant's residual functional capacity or "RFC" is used in steps four and five to determine the claimant's ability to perform her past work or any other type of work. Id. The RFC is an assessment of the most a claimant can still do despite her limitations and is determined based on all the relevant evidence in the case record. Id.; see 20 C.F.R. § 945(a)(1). At the hearing level, the ALJ is solely responsible for assessing RFC. 20 C.F.R. § 416.946(c); see Taylor v. Astrue, 706 F.3d 600, 602–03 (5th Cir. 2012).

### b.  *Standard of Review.*

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez, 415 F.3d at 461.  Substantial evidence is more than "a mere scintilla," but less than a preponderance.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Hames v. Heckler, 707 F.2d 162, 164 (5th Cir. 1983). "It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (quoting Consol. Edison Co. of New York v. N.L.R.B., 305 U.S. 197, 229 (1938)). This court may not re-weigh the evidence, try the issues *de novo*, or substitute its judgment for the Commissioner's.  Perez, 415 F.3d at 461.

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91, 113 (1992).  Despite this Court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).

Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

### c.  Step 3 Assessment of Listed Impairments

The impairments listed in 20 C.F.R. part 404, subpart P, Appendix 1, are "defined in terms of several specific medical signs, symptoms, or laboratory test results." Sullivan v. Zebley, 493 U.S. 521, 530 (1990). "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." Id.  To show that his unlisted impairment or combination of impairments medically equals a listed impairment, "he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." Id.  at 531. The criteria are intentionally set at a higher level than the statutory standard because if a person meets or medically equals one of the listed impairments, they are presumed disabled and awarded benefits without further inquiry. Id.  at 532.

### d.  New Evidence Submitted to the Appeals Council

The regulations provide that the Appeals Council will receive additional evidence if it is "new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision." 20 C.F.R. § 404.970(a)(5). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland v. Washington, 466 U.S. 668, 694 (1984).

### e.  Evaluation of Symptoms, Including Pain

The regulations provide that the Social Security Administration will consider all of the claimant's symptoms, including pain and the extent to which those symptoms "can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a). The claimant's statements about their pain or other symptoms will not alone establish

that a claimant is disabled. Id.  First, there "must be objective medical evidence from an acceptable medical source that shows [claimant has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged." Id.  If so, the Social Security Administration considers all of the evidence to evaluate the intensity and persistence of those symptoms to determine the extent to which they limit the claimant's ability to work. Id. § 404.1529(c)(1); see Soc. Sec. Ruling 16-3p Titles II & XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3P (S.S.A. Oct. 25, 2017), 2017 WL 5180304, at *3. In evaluating the intensity and persistence of a claimant's symptoms, including pain, the Social Security Administration will consider factors such as:

> (i) [Claimant's] daily activities;
> (ii) The location, duration, frequency, and intensity of [claimant's] pain or other symptoms;
> (iii) Precipitating and aggravating factors;
> (iv) The type, dosage, effectiveness, and side effects of any medication [claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms;
> (v) Treatment, other than medication, [claimant] receive[s] or [has] received for relief of [claimant's] pain or other symptoms;
> (vi) Any measures [claimant] use[s] or [has] used to relieve [claimant's] pain or other symptoms (e.g., lying flat on . . . back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
> (vii) Other factors concerning [claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).

**II.    Plaintiff's Appeal**.

*Issue No. 1.    Did the ALJ err in failing to qualify Mr. Cooper's Crohn's disease as a disability?*

Mr. Cooper argues that the ALJ erred in failing to find that Mr. Cooper's Crohn's disease meets the criteria of Listing 5.06. Mr. Cooper cites the regulation presently in effect, but the applicable regulation is the one in effect at the time of the ALJ's decision.[4] See Young v. Berryhill,

---

[4] Mr. Cooper's primary argument appears to be that he meets the requirements of subsection C. However, the subsection C criteria he cites were not in effect at the time of the ALJ's decision.

689 F. App'x 819, 822 n. 3 (5th Cir. 2017); Mills v. Berryhill, No. 4:16-CV-0331-Y-BL, 2017 WL

3972009, at *1 n.5 (N.D. Tex. Aug. 3, 2017), report and recommendation adopted, No. 4:16-CV-

331-Y, 2017 WL 3891391 (N.D. Tex. Sept. 6, 2017). In October 2022, Listing 5.06 provided the

following criteria:

> Inflammatory bowel disease (IBD) documented by endoscopy, biopsy, appropriate
> medically acceptable imaging, or operative findings with:
>
> A. Obstruction of stenotic areas (not adhesions) in the small intestine or colon with
> proximal dilatation, confirmed by appropriate medically acceptable imaging or in
> surgery, requiring hospitalization for intestinal decompression or for surgery, and
> occurring on at least two occasions at least 60 days apart within a consecutive 6–
> month period;
>
> OR
> B. Two of the following despite continuing treatment as prescribed and occurring
> within the same consecutive 6–month period:
> 1. Anemia with hemoglobin of less than 10.0 g/dL, present on at least two
> evaluations at least 60 days apart; or
> 2. Serum albumin of 3.0 g/dL or less, present on at least two evaluations at least 60
> days apart; or
> 3. Clinically documented tender abdominal mass palpable on physical examination
> with abdominal pain or cramping that is not completely controlled by prescribed
> narcotic medication, present on at least two evaluations at least 60 days apart; or
> 4. Perineal disease with a draining abscess or fistula, with pain that is not
> completely controlled by prescribed narcotic medication, present on at least two
> evaluations at least 60 days apart; or
> 5. Involuntary weight loss of at least 10 percent from baseline, as computed in
> pounds, kilograms, or BMI, present on at least two evaluations at least 60 days
> apart; or
> 6. Need for supplemental daily enteral nutrition via a gastrostomy or daily
> parenteral nutrition via a central venous catheter.

20 C.F.R. § Pt. 404, Subpt. P, App. 1 (Listing 5.06) (eff. July 18, 2022, to Oct. 5, 2023). The ALJ

found that Mr. Cooper did not meet or equal the requirements of subsection A because he did not

have hospitalization or surgery as required by this listing. Indeed, the ALJ correctly observed that

Mr. Cooper underwent a right nephroureterectomy, ileocecectomy, and ileorectal fistula take down

on October 20, 2020. But there is no record of a second hospitalization for intestinal decompression

or surgery at least 60 days apart from that one and within a consecutive 6–month period. Mr. Cooper cites only the October 20, 2020, surgery and argues that because it was performed within 60 days of the September 16, 2020, diagnosis, he meets the requirement. However, the regulation clearly requires two surgeries/hospitalizations (obstruction "requiring hospitalization for intestinal decompression or for surgery, and occurring on at least two occasions"). Id. Mr. Cooper has not shown that he meets or medically equals the requirements of subsection A.

Mr. Cooper does not cite subsection B of the applicable regulation. Nonetheless, the Court finds no error in the ALJ's conclusion that Mr. Cooper did not meet or equal the requirements of subsection B because there is no evidence of serum levels as required, two hemoglobin levels as required, abdominal masses as required, uncontrolled pain as required, involuntary weight loss of at least ten percent of baseline as required, or supplemental daily enteral nutrition via a gastrostomy or daily parenteral nutrition as required.

The Court finds no error in the ALJ's finding that Mr. Cooper did not meet or medically equal the severity of Listing 5.06.

*Issue No. 2.    Did the ALJ err in determining Mr. Cooper's educational level?*

Mr. Cooper argues that the ALJ erred in finding that Mr. Cooper had "limited education." Instead, he submits that the record shows that he was in special education from third grade until eighth grade, when he dropped out. He insists that this level of education falls closer the classification of "illiteracy."

The regulations recognize that due to the passage of time, the numerical grade level a person completed may not represent the person's actual educational abilities. Nonetheless, "if there is no other evidence to contradict it, we will use your numerical grade level to determine your educational abilities." 20 C.F.R. § 404.1564(b). The regulations define the following categories:

(1) Illiteracy. Illiteracy means the inability to read or write. We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal schooling.

(2) Marginal education. Marginal education means ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs. We generally consider that formal schooling at a 6th grade level or less is a marginal education.

(3) Limited education. Limited education means ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs. We generally consider that a 7th grade through the 11th grade level of formal education is a limited education.

Id.

There is no dispute that Mr. Cooper reached the numerical grade level that is categorized as "limited education." Mr. Cooper relies on his testimony that he attended special education. The Social Security Administration's guidance recognizes that "an extensive history of special education may show that the individual's educational abilities are lower than the actual grade he or she completed." SSR 20-01p: Titles II and XVI: How We Determine an Individual's Education Category. Importantly, though, it instructs that the Social Security Administration "will not find an individual's education category to be lower than his or her highest level of formal education based solely on an individual's history of having received special education." Id. Instead, "[i]n all cases, we determine facts on an individual basis. Therefore, to assign an individual to an education category lower or higher than his or her highest level of formal education, there must be specific evidence supporting the finding in the determination or decision." Id.

Here, Mr. Cooper testified that he completed eighth grade and was in special education. Yet in his application materials, he reported he had completed tenth grade in 2006 or 2007 and that he did not attend special education classes. R. at 281. In his application materials he also reported that he could read and understand English and write more than his name. R. at 279. He listed

reading as a hobby and reported checking email and reading a book for 15 minutes as typical daily activities. R. at 290. Additionally, Mr. Cooper had prior work experience as a stocker. R. at 94. The vocational expert classified this job as DOT 299.367-014, which is classified as requiring language development level 2:

> Reading: Passive vocabulary of 5,000-6,000 words. Read at rate of 190-215 words per minute. Read adventure stories and comic books, looking up unfamiliar words in dictionary for meaning, spelling, and pronunciation. Read instructions for assembling model cars and airplanes.

U.S. Dep't of Labor, I Dictionary of Occupational Titles 237 (4th Ed. 1991); U.S. Dep't of Labor, II Dictionary of Occupational Titles 1009-12 (4th Ed. 1991). As the Commissioner points out, the SSA guidance provides that "Past work experience and the kinds of responsibilities the individual had while working . . . may show that the individual has significant intellectual ability that can be used to work." SSR 20-01p: Titles II and XVI: How We Determine an Individual's Education Category. Here, Mr. Cooper's past work as a stocker supports a finding of no less than a "limited education" level. The Court finds that substantial evidence supports the ALJ's conclusion that Mr. Cooper had a "limited education."

Issue No. 3    *Did the ALJ err in relying on vocational expert testimony who only spoke to jobs that are inconsistent with Mr. Cooper's educational history and mental impairments?*

Mr. Cooper argues that the ALJ did not meet his burden at Step 5[5] because the ALJ relied on testimony from the vocational expert as to jobs that Mr. Cooper could not perform. This argument appears to be based on the vocational expert's testimony that a person who reads at a

---

[5] Mr. Cooper also argues that the ALJ erred because he did not consider that the burden shifted to the Commissioner at Step 5. He offers no support for this interpretation of the ALJ's decision. At Step 5, the ALJ relied on the record evidence in determining Mr. Cooper's RFC and the vocational expert's testimony regarding available jobs, thereby making a showing that jobs exist in the national economy that Mr. Cooper can perform. See Perez, 415 F. 3d  at 461 (explaining that at Step 5, "the burden shifts to the Commissioner . . . to show that the claimant can perform other substantial work in the national economy" and "[o]nce the Commissioner makes this showing, the burden shifts back to the claimant to rebut this finding." (quotations omitted)).

third-grade reading level could not perform the listed jobs and that a person who requires instructions by picture instead of written words could not perform the listed jobs. However, the ALJ found that Mr. Cooper has the RFC to read at a fourth grade level. And the vocational expert testified that a person who reads at a fourth grade level could perform the listed jobs. Here, the ALJ did not err in relying on vocational expert testimony that was consistent with the ALJ's assessment of Mr. Cooper's RFC. See Masterson v. Barnhart, 309 F.3d 267, 273–74 (5th Cir. 2002) (holding that the ALJ's finding that the claimant could perform certain jobs as testified to by the vocational expert was supported by substantial evidence where "the ALJ scrupulously incorporated into the hypothetical questions [to the vocational expert] all of [the claimant's] disabilities supported by evidence and recognized by the ALJ"); Pineda v. Astrue, 289 F. App'x 710, 714 (5th Cir. 2008) ("The ALJ correctly described [the claimant's] limitations to the vocational expert, so we should accord weight to his testimony delineating jobs that met [the claimant's] exertional and other capabilities.").

Mr. Cooper also asserts that the ALJ failed to resolve conflicts between the vocational expert's testimony and the dictionary of occupational titles. He does not identify the purported conflict and none is apparent. The Court can find no error with regard to purported conflicts between the vocational expert's testimony and the dictionary of occupational titles.

*Issue No. 4:    Did the Appeals Council err by failing to review supplemental records submitted regarding Mr. Cooper's educational impairment?*

Mr. Cooper argues that the Appeals Council erred in failing to consider the proof he submitted that he has an educational impairment. The "proof" that Mr. Cooper refers to is the vocational testing results of a test administered on August 2, 2022. The results are discussed by Mr. Cooper's counsel in the Petition for Reconsideration that was submitted to the Appeals

Council. R. at 366-67. Two pages of what may be a vocational expert's report were submitted along with other records to the Appeals Council.[6] R. at 78-79. The first page recites that Mr. Cooper was administered the Woodcock-Johnson IV Tests of Achievement to assess his reading recognition and reading comprehension. R. at 78. It states that in the Letter-Word identification subtest, he scored at the 3.1 grade level and that on the Passage Comprehension subtest he scored at the 1.6 grade level. Id. The Appeals Council described the document as a "partial report . . . of unknown origin." R. at 3. Indeed, there is no indication who prepared the pages, what their qualifications were, or when they prepared it. In any event, the Appeals Council did not accept these exhibits as evidence, finding that it did not show a reasonable probability that it would change the outcome of the ALJ's decision. Id.

As the Commissioner points out, Mr. Cooper has not presented evidence of a diagnosis of any medically determinable mental impairment made by a medically acceptable source. The partial report submitted by Mr. Cooper regarding his reading level does not identify who performed the testing and prepared the report. The Court finds that this incomplete report could not have changed the outcome of the ALJ's decision. This is especially so in light of the other evidence of record. As noted above, Mr. Cooper testified that he completed eighth grade (and reported in his application that he completed tenth grade). And he worked for several years as a stocker. There is no evidence to suggest that Mr. Cooper has suffered a decline in his mental abilities since that time. There were no medical records before the ALJ to support finding a mental impairment at all. Under the circumstances, the Court finds no error in the Appeals Council's decision not to accept

---

[6] Mr. Cooper has not explained why this report, if it was indeed prepared in August 2022, was not submitted to the ALJ at or before the October 11, 2022, hearing. He has not explained why the report was incomplete or where the rest of the report may be.

as an exhibit the partial report of unknown origin: there is no reasonable probability that it would have changed the ALJ's decision.

*Issue No. 5:    Did the ALJ err in considering Mr. Cooper's testimony about his pain?*

Mr. Cooper argues that his pain level has consistently been at a level of 5 to 7. He complains that the ALJ only considered Mr. Cooper's Crohn's disease and his degenerative disc disease. He argues that he had a combination of severe impairments that also included chronic low back pain as a result of a motor vehicle accident, disc desiccation, lack of sufficient education due to a learning disorder, and borderline intellectual functioning. He argues that consideration of his combination of impairments should have led to the conclusion that he is not able to perform any job in the national economy.

The Commissioner argues that the ALJ properly considered Mr. Cooper's alleged symptoms, including his pain. He points out that the ALJ considered a range of evidence such as the medical records, opinions, and prior administrative findings; Mr. Cooper's daily activities; the nature, location, duration, frequency, and intensity of his pain; the medications he has taken; other treatment he has received; and his functional limitations. In so doing, the Commissioner insists that the ALJ complied with the regulations. He argues that substantial evidence supports the ALJ's finding that Mr. Cooper's alleged symptoms were not entirely consistent with the evidence of record.

The Court finds that the ALJ complied with the regulations in assessing Mr. Cooper's pain and that substantial evidence supports the ALJ's conclusion. First, as the Commissioner points out, the ALJ's analysis of Mr. Cooper's pain symptoms included several factors suggested by the regulations. See 20 C.F.R. § 404.1529(c)(3). The ALJ also considered the medical evidence of record and found Mr. Cooper's allegations of pain to be inconsistent with medical records showing

improvement with treatment, findings of four out of five strength and intact sensation for light touch for dermatomes L3-S1, and self-reported ability to lift twenty pounds and ability to perform activities of daily living independently. Not only is the ALJ's RFC assessment consistent with the opinions of the state agency reviewing physicians, but also with the opinions of Dr. Day, who examined Mr. Cooper in November 2021, and Dr. Rodriguez, who examined Mr. Cooper in May 2020 after Mr. Cooper had been treating with him for almost a year. Moreover, the medical records do appear to show improvement in Mr. Cooper's back pain. Following the July 2020 endoscopic medial branch rhizotomies/neurotomies, the records show his back pain was present "sometimes," and was at a level of 2 out of 10 during the appointment and 4 of 10 at its worst. R. at 495. There are no medical records pertaining to lower back pain after that July 17, 2020, follow up appointment. At a January 2021 appointment to establish care for Crohn's disease, it was noted that his low back pain did not seem particularly remarkable and that his exam was effectively normal. R. at 609. The Court finds the ALJ did not err in considering Mr. Cooper's allegations of pain.

*Issue No. 6:        Did the ALJ err in failing to find that Mr. Cooper had a severe mental impairment?*

Mr. Cooper argues that the ALJ erred in failing to find that Mr. Cooper has a severe mental and educational impairment. He submits that the basic mental demands of competitive remunerative, unskilled work include the ability to understand, carry out and remember simple instructions, to respond appropriately to supervision, coworkers, and usual work situations and to deal with changes in a routine work setting. He argues that a substantial loss in the ability to perform any of these activities would severely limit the potential occupational base. He argues that the ALJ erred in finding his mental impairments non-severe. And he argues the ALJ erred further

by failing to consider his mental impairments in combination with his physical impairments in the ALJ's later analysis.

The Commissioner responds that to the extent Mr. Cooper argues that the ALJ should have considered his educational level at Step 2, he is incorrect. Indeed, the Commissioner correctly points out that the regulations provide that the agency "will not consider [the claimant's] age, education, and work experience" in the Step 2 "severe impairment" assessment. 20 C.F.R. § 404.1520(c). The focus at Steps 1 and 2 is on impairments which "must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1521.

The Court finds no error in the ALJ's failure to find Mr. Cooper's alleged mental impairments did not qualify as severe. There is no record of a physiological or psychological abnormality. Accordingly, there is no basis to find Mr. Cooper has a severe mental impairment. Mr. Cooper only invokes his testimony regarding his educational level and he argues that he has deficiencies in literacy. But educational level is not considered in the severity analysis.

## **RECOMMENDATION**

Accordingly, IT IS RECOMMENDED that the decision of the Commissioner be affirmed and the appeal of the plaintiff be denied.

## **OBJECTIONS**

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will

result from a failure to object.  <u>Douglass v. United Servs. Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th

Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 26th day of June, 2024.


_____
Janis van Meerveld
United States Magistrate Judge